879 A.2d 1025

**MEDICAL MUTUAL LIABILITY INSURANCE SOCIETY OF MARYLAND, et al.**

**v.**

**Barrett GOLDSTEIN, M.D.**

**No. 134, Sept. Term, 2004.**

Court of Appeals of Maryland.

Aug. 9, 2005.

300

Michelle R. Callender (David A. Levin of Wharton, Levin, Ehrmantraut & Klein, P.A., Annapolis, MD), on brief; Albert J. Mazzanotte, Jr. (Edward M. Buxbaum and Amy E. Askew of Whiteford, Taylor & Preston, L.L.P., Baltimore, MD), on brief, for Appellants.

James P. Gleason, Jr. (Jennifer E. Phillips of Gleason, Flynn, Emig & Fogleman, Chtd., Rockville, MD), on brief, for Appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

This matter arises from a declaratory judgment action filed by Barrett Goldstein, M.D. against Property and Casualty Insurance Guaranty Corporation ("PCIGC"),[1] and Medical Mutual Liability Society of Maryland ("Medical Mutual"). Dr. Goldstein, an orthopedic surgeon, sought a determination of whether PCIGC or Medical Mutual was obligated to provide a defense and indemnification for him in a contribution action filed by Montague Blundon, III, M.D. The Circuit Court for Montgomery County held that both companies were obligated to provide a defense and to indemnify Dr. Goldstein. PCIGC and Medical Mutual appealed. Prior to consideration of the matter in the Court of Special Appeals we granted *certiorari* on our own motion. *See Medical Mutual Liability Society of Maryland v. Goldstein*, 385 Md. 161, 867 A.2d 1062 (2005).

---

1. PCIGC is "an entity established by the General Assembly to provide for the payment of claims covered by policies of property or casualty insurance companies that become insolvent." *Maryland Motor Truck Assn. Workers' Compensation Self–Insurance Group v. Prop. & Cas. Ins. Guar. Corp.*, 386 Md. 88, 90, 871 A.2d 590, 591 (2005). The insolvent insurer in this matter is P.I.E. Mutual Insurance Company ("PIE Mutual"), Dr. Goldstein's insurance company when the underlying medical malpractice suit arose.

PCIGC contends that the trial court erred in failing to apply the bar date restriction included in the definition of "covered claim" in PCIGC's operating statute, Md.Code (1995, 2003 Repl.Vol.) § 9–301(d)(1) of the Insurance Article ("INS").[2] In the alternative, it argues that the trial court erred in determining that PCIGC and Medical Mutual have a co-extensive duty to defend and indemnify Dr. Goldstein. According to PCIGC, the trial court's interpretation violated INS § 9–310,[3] which requires Dr. Goldstein to exhaust coverage by another insurer before pursuing coverage by PCIGC. Medical Mutual argues that the trial court erred in declaring it responsible for the defense and indemnification because its policy explicitly excludes coverage for claims "first made" prior to the policy period. It also argues that Dr. Goldstein should be estopped from taking a position that is inconsistent with the theory, which he successfully argued against PCIGC, that the contribution claim is "the same injury" asserted in the medical malpractice action because it is an "additional claim made for damages resulting from the same injury."

We hold that, based on the plain language of the statute, Dr. Goldstein's claim for indemnification is not a "covered claim" because it was not presented to PCIGC prior to the absolute and final bar date as required by INS § 9–301(d)(1)(ii). Timely notice to PCIGC of an actual claim is not timely notice of all

2. INS § 9–301(d)(1) provides, in relevant part, that "covered claim" means an insolvent insurer's unpaid obligation, including an unearned premium:

   (i) that: 1. A . . . . arises out of a policy of the insolvent insurer issued to a resident or payable to a resident on behalf of an insured of the insolvent insurer; (ii) that is presented on or before the last date fixed for the filling of claims in the domiciliary delinquency proceeding as a claim to the corporation or to the receiver in the State; (iii) that: . . . was incurred or existed before, on, or within 30 days after the determination of insolvency; (iv) that arises out of a policy or surety bond of the insolvent insurer issued for a kind of insurance to which the subtitle applies.

3. INS § 9–310(a)(1) provides:

   A person with a claim against an insurer under a policy or surety bond that is also a covered claim against an insolvent insurer shall exhaust first the person's rights under the policy or surety bond.

potential claims arising out of the same event. Accordingly, PCIGC is not obligated to provide a defense and to indemnify Dr. Goldstein in the contribution action. Additionally, we hold that, based on the language of the Medical Mutual policy, Medical Mutual is not required to provide a defense or indemnification to Dr. Goldstein in the contribution action. Although the contribution action was "first made" during the coverage period, January 1, 2002, to January 1, 2003, the first claim against Dr. Goldstein arising out of the injury to Ms. Taylor was made prior to the coverage period. The policy specifically states that "[a]ll 'claims' for damages arising out of any one 'incident' will be deemed to have been made at the time the first of those 'claims' is first made against any insured." Therefore, the claim is not covered by the policy.

## Facts

The contribution action arose from a medical malpractice suit brought by Shirley Taylor against Doctors Goldstein and Blundon on January 6, 1995. The malpractice suit, HCA No. 95–006, arose from a surgical procedure performed in 1992 on Ms. Taylor's hip by Dr. Blundon. Dr. Goldstein assisted in the surgery. On February 20, 1997, the Health Claims Arbitration Panel entered an award against Dr. Blundon in the amount of $503,189.64, and entered an award in favor of Dr. Goldstein. On November 20, 1997, the Circuit Court for Montgomery County confirmed the Panel's determination. Dr. Blundon appealed. We affirmed the Circuit Court's ruling. *See Blundon v. Taylor,* 364 Md. 1, 770 A.2d 658 (2001). No appeal was taken by either Dr. Blundon or Ms. Taylor regarding the Panel's conclusion in favor of Dr. Goldstein. On April 16, 2002, Dr. Blundon filed the underlying contribution action, HCA No. 2002–177, seeking $312,450 plus cost and interest from Dr. Goldstein. The contribution action has been stayed pending the outcome of this litigation.[4]

---

4. The merits of the contribution action have no bearing on our resolution of this matter and nothing in this opinion should be interpreted as a comment thereon.

After receiving notice of the contribution action, Dr. Goldstein notified Medical Mutual and PCIGC. He sought a defense and indemnification from both companies pursuant to his respective insurance policies. PCIGC denied coverage on the basis that the claim was filed two-and-a-half years after the final bar date established in the PIE Mutual insolvency proceeding and, therefore, the claim was not a "covered claim" within the meaning of INS § 9–301(d)(1). Medical Mutual denied coverage on the basis that the policy Dr. Goldstein maintained with the company was a "claims first made" policy which limits coverage to "claims which are first made against any insured during the policy period for 'incidents' occurring after the Retroactive Date specified in the Declaration." The policy further states that "all claims for damages arising out of any one 'incident' will be deemed to have been made at the time the first of those 'claims' is first made against any insured." Medical Mutual took the position that because the underlying medical malpractice suit was the first claim made against an insurer for damages arising out of the treatment of Ms. Taylor, the claim was "first made" in 1995 and, therefore, not covered by its policy.

In March of 2003, Dr. Goldstein filed a declaratory judgment action against PCIGC and Medical Mutual to determine whether either company was obligated to provide him with a defense and indemnification in the contribution action. PCIGC filed a motion to dismiss or in the alternative a motion for summary judgment on the same grounds that it originally denied the claim. On June 2, 2003, the Circuit Court for Montgomery County denied PCIGC's motion on the basis that the language of the PIE Mutual policy,[5] which defines the contribution action as a claim pursuant to the policy, "does

---

5. The PIE Mutual policy provides that "if any claim is first made during the policy period alleging injury to an individual that would be covered by this policy, any additional claim made for damages resulting from the same injury shall be considered a claim hereunder. A claim shall be considered to be first made when the company first receives notice of the claim or occurrence."

have some relevance." [6]

PCIGC filed a motion for reconsideration and Dr. Goldstein filed a motion for summary judgment. The court began the hearing by noting:

> To me, when I read it, the claim itself clearly falls within the definition of a covered claim under the PIE [Mutual] policy. The issue is does the statute which defines covered claim, change that when it refers to the time it has to be filed and the order with the absolute drop dead bar date.

After argument by both parties the court granted Dr. Goldstein's motion, holding:

> The aspect of this claim that we're talking about which, in essence, is the cross claim not filed earlier, is only under the PIE [Mutual] policy because it is an extension of the original claim that was made. And, since the earlier one

---

**6.** The court stated:

> Okay. Well, I'll be honest with you. I'm the *nisi prius* Judge here and probably what I have to say about this is of little moment, but it seems to me that there are some policy issues here. One is the finality right of the receiver. That's a very important issue because I think the receiver has to be able to gauge what its exposure is because it doesn't have the ability to go and charge premiums and things like that. And depending on the statutory scheme behind these kinds of things that may or may not be a very important deal.
>
> The other, I think, important policy question is whether or not persons who receive a decision that they are not liable from which a final appeal is not taken, is expected to anticipate that this contingent litigation and I think that the answer to both of those is that they're both very strong, important reasons, one is in the microcosm and one is in the macrocosm.
>
> The court is required to choose between the two policy concepts, and in this case, I think that the court will deny the motion for summary judgment because it is my belief that the language of the PIE [Mutual] policy probably does have some relevance. Whether or not, as [counsel for Dr. Goldstein] asserts, that it encompasses "how claims are handled" or not strikes me as problematic but it seems to me it's probably an issue as to matter of law as to what the PIE [Mutual policy] says and whether or not that makes it into a new claim or into a survival claim.

was timely, this being the extension of it, I'm finding that it is as well timely and not covered by the bar date.

PCIGC indicated that they would appeal the decision.

In May of 2004, Dr. Goldstein filed a motion for summary judgment against Medical Mutual. Medical Mutual opposed the motion and filed a cross-motion for summary judgment on the "claim first made" basis discussed above. Medical Mutual also argued that Dr. Goldstein should be estopped from taking a position that is inconsistent with the theory that he success-fully argued against PCIGC, that the contribution claim is "the same injury" asserted in the medical malpractice action because it is an "additional claim made for damages resulting from the same injury." On July 6, 2004, a hearing was held regarding the motions. The court held:

> Well, it is truly a fascinating issue and I think the art of writing insurance policies is trying to figure out all the permutations and combinations of things that could happen in the future and plan for them. And here we have two different policies with slightly different language in the policies and I guess the question is can you walk that fine line where potentially you could have coverage by both.

> And looking at the language in the old, in the PIE [Mutual] policy, any additional claim made for damages resulting in the same injuries shall be considered a claim hereunder, which doesn't seem to have the same parameters on it and it seems to me that there is kind of a narrow alley between those respective coverage definitions that would allow for coverage of the Med Mutual policy, without being inconsistent, which it does, at first glance, seem to be but it seems to me that under both of those languages, that coverage could be found without one contradicting the other.

> So for those reasons, I am going to find that summary judgment is appropriate in favor of Dr. Goldstein. I do find that there is no genuine dispute as to material fact and that the fair and appropriate reading of the policy would provide that this is a claim made within the coverage period.

The appeals from both declaratory judgment actions were consolidated into the present action.

## Standard of Review

We recently discussed our standard of review for a trial court's grant of summary judgment in the case of *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 867 A.2d 1026 (2005). We said:

> Under Md. Rule 2–501(e), summary judgment may be granted if "the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." When making a summary judgment decision, the trial court must not determine any disputed facts. Rather, considering the undisputed facts, the court must decide if the moving party is entitled to judgment as a matter of law. *Williams v. Mayor and City Council of Baltimore*, 359 Md. 101, 114, 753 A.2d 41, 48 (2000) (internal citations omitted). We review the grant of summary judgment *de novo*. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98, 105 (2004). Whether the circuit court properly granted summary judgment is a question of law. *Id.* We must decide if the trial court's decision was legally correct. *Id.*

*Rockwood*, 385 Md. at 106, 867 A.2d at 1029–30.

## The Claim Against PCIGC

At the time that the medical malpractice suit arose, Dr. Goldstein was insured by PIE Mutual.[7] On March 23, 1998, an insolvency proceeding involving PIE Mutual was instituted in the Court of Common Pleas in Franklin County, Ohio. Subsequently, PIE Mutual was determined to be insolvent and the Franklin County court executed an order of liquidation.

---

7. PIE Mutual provided Dr. Goldstein with a defense in the Taylor suit until its insolvency. In August of 1998, PCIGC notified Dr. Goldstein that it would assume his defense in the Taylor matter.

On February 17, 1999, the Franklin County court entered an order stating, in relevant part:

2. The Bar Date in the [PIE Mutual] liquidation proceeding be, and the same hereby is, EXTENDED to September 23, 1999. September 23, 1999 is ESTABLISHED to be the Absolute Final Bar date in this liquidation proceeding.

4. The Liquidator's determination not to exercise discretion to accept, for any reason, any late filed Proofs of Claim, under R.C. § 3903.35(B) and (D), be, and the same hereby is, APPROVED.

6. All Contingent Claims and all Future Claims, as defined in the Notice, will be forever barred and foreclosed after September 23, 1999.

The Notice defined "Contingent" and "Future" Claims as,

claims which have not yet fully developed and ripened into actual litigated claims. A claim is a Contingent Claim unless an actual lawsuit has been filed as to the claim or unless the claimant has made a formal written, demand for payment on the claim, which demand specifically describes the circumstances of the incident in sufficient detail to both (a) describe a matured, legitimate claim and (b) support a complaint based solely on the information contained in the demand.... "Future Claims" are claims which are presently unknown to the creditors, which arise from and after September 23, 1999.

PCIGC is the successor to PIE Mutual in Maryland. It is governed by subtitle 3 of Title 9 of the Insurance Article. INS §§ 9–301 through 9–316. It is a private, nonprofit, nonstock corporation. INS § 9–304(a)(2). The purpose of the subtitle is "to provide a mechanism for the prompt payment of covered claims under certain policies and to avoid financial loss to residents of the State who are claimants or policyholders of an insolvent insurer; and to provide for the assessment of the cost of payments of covered claims and protection among insurers." INS § 9–302. Insurance companies doing business in Maryland are required as a condition of their

authority to transact business in the State to be a member of PCIGC. INS § 9–304(b). Member insurance companies pay an annual assessment to cover the expenses of PCIGC incurred as a result of an insurance company's insolvency. INS § 9–306(d).

PCIGC is only obligated to pay "covered claims." INS § 9–306;[8] *see also Maryland Motor Truck,* 386 Md. at 95, 871 A.2d at 594. The term "covered claim" is defined in INS § 9–301(d). It provides, in relevant part, that a "covered claim" is:

(1) [A]n insolvent insurer's unpaid obligation, including an unearned premium: (i) that: 1. A . . . . arises out of a policy of the insolvent insurer issued to a resident or payable to a resident on behalf of an insured of the insolvent insurer; (ii) that is presented on or before the last date fixed for the filing of claims in the domiciliary delinquency proceeding as a claim to the corporation or to the receiver in the State; (iii) that: . . . was incurred or existed before, on, or within 30 days after the determination of insolvency; and (iv) that arises out of a policy or surety bond of the insolvent insurer issued for a kind of insurance to which the subtitle applies.

INS § 9–301(d)(1). Accordingly, PCIGC is obligated to provide Dr. Goldstein with a defense in the contribution action provided the claim is an unpaid obligation of PIE Mutual that satisfies all four requirements.

PCIGC does not challenge Dr. Goldstein's position that the contribution action is an unpaid obligation of PIE Mutual. The PIE Mutual policy provides, in relevant part:

If any claim is first made during the policy period alleging injury to an individual that would be covered by this policy, any additional claim made for damages resulting from the

---

8. INS § 9–306(a) provides, in relevant part:

[T]he Corporation shall be obligated to the extent of the covered claims existing on or before the determination of insolvency arising: (i) within 30 days after the determination of insolvency; (ii) before the policy expiration date, if that date is less than 30 days after the determination of insolvency; or (iii) before the insured replaces the policy or causes its cancellation, if the insured does so within 30 days after the determination of insolvency.

same injury shall be considered a claim hereunder. A claim shall be considered to be first made when the Company first receives written notice of the claim or occurrence.

By the terms of the policy, the contribution claim is an "additional claim made for damages resulting from" the injury to Ms. Taylor, and, consequently, is considered a claim under the policy. Likewise, PCIGC does not challenge that the requirements (i), (iii), and (iv) are met. What PCIGC does dispute is requirement (ii)—that a claim must be presented to PCIGC on or before the last date fixed for the filing of claims in the domiciliary proceeding.

■ The "last date fixed for the filing of claims" or "the Absolute Final Bar Date" in the liquidation of PIE Mutual, as established by the Court of Common Pleas for Franklin County, was September 23, 1999. The contribution action was filed April 16, 2002, approximately two-and-a-half years after the "last date fixed for the filing of claims." Apparently, Dr. Goldstein had no notice of the contribution suit until it was filed. Although the record does not indicate precisely when Dr. Goldstein notified PCIGC of the lawsuit, beyond stating that he did notify them after he received notice of the action, he clearly notified them after September 23, 1999.

■ "The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). "The first step in determining legislative intent is to look at the statutory language and 'if the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as written.'" *Id.* (quoting *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1204 (1994)). Based on the plain language of the statute, the contribution claim is not a "covered claim" because it was not "presented [to PCIGC] on or before the last date fixed for the filing of claims."

Despite the plain language of the statute, Dr. Goldstein contends that in determining what qualifies as a "covered claim" within the meaning of the statute, the court should look

to the underlying insurance policy. His argument is that because the contribution claim would be a claim under the policy, it is a "covered claim" within the meaning of the statute. In support of this argument, he relies on the case of *Igwilo v. Prop. & Cas. Ins. Guar. Corp.*, 131 Md.App. 629, 750 A.2d 646 (2000). The question in *Igwilo* was how many "covered claims" existed. The court quoted from INS § 9–301(d) for the definition of "covered claim" stating that it is "an insolvent insurer's unpaid obligation ... that ... arises out of a policy of the insolvent insurer." *Igwilo*, 131 Md.App. at 637, 750 A.2d at 650. The court looked to the language of the policy and concluded that there existed two "covered claims" that were subject to the $299,900 statutory cap per "covered claim." *Igwilo*, 131 Md.App. at 645, 750 A.2d at 655.

Dr. Goldstein's reliance on *Igwilo* is misplaced. As we noted in the present case, the definition of "covered claim" in INS § 9–301(d)(1) encompasses more than the section quoted in the Court of Special Appeals opinion. It is a four-part definition that places limitations on what qualifies as a "covered claim" pursuant to the statute. The intermediate appellate court in *Igwilo* aptly noted that "what constitutes a 'claim' under the policy does not resolve the issue of what constitutes a 'covered claim' under the statute." *Igwilo*, 131 Md.App. at 641, 750 A.2d at 652. By definition, not all claims recognizable under the insurance policy are "covered claims" pursuant to the statute. Only those "unpaid obligations" of the insolvent insurer that satisfy all four parts of the definition are "covered claims" pursuant to the statute. If we adopted Dr. Goldstein's position that the sole question in determining what qualifies as a "covered claim" is whether the claim would be covered by the underlying policy, then sections (d)(ii)-(iv) of INS § 9–301 would be rendered meaningless. Such a result is contrary to our case law. *See Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 550, 814 A.2d 469, 490 (2002) (stating that "[i]f reasonably possible, a statute is to be read so that no word, phrase, clause, or sentence is rendered surplusage or meaningless").

Dr. Goldstein further argues that because the PIE Mutual policy states that "any additional claim made for damages resulting from the same injury shall be considered a claim hereunder," presentment of the medical malpractice claim "comprehended not only the immediate claim set forth in the [medical malpractice] complaint, but also any additional claims arising from the same injury." The argument continues saying, "[t]herefore, the presentment that PCIGC received for [the medical malpractice suit] before the bar date comprehended the presentment of the contribution claim." This appears to be the position taken by the Circuit Court in granting Dr. Goldstein's motion for summary judgment. The court stated that "because it is an extension of the original claim that was made. And, since the earlier one was timely, this being the extension of it, I'm finding that it is as well timely and not covered by the bar date." We disagree.

The filing deadline in the statute represents a legislative determination that PCIGC is not liable for every claim that could be brought against the insurance carrier had it not become insolvent. The deadline makes it possible for PCIGC to reasonably anticipate its potential liability which in turn allows it to participate in the liquidation proceedings of the insolvent insurer and assess its members accordingly. *See* INS §§ 9–309(c)[9] and 9–306(d)(1)(ii).[10] The deadline serves the important purpose of providing finality to both the liqui-

---

9. INS § 9–309(c) allows PCIGC to seek reimbursement from the insolvent insurer's estate. It provides, in relevant part, that:

(1) The Corporation periodically shall file with the receiver or liquidator of the insolvent insurer: (i) statements of the covered claims should be paid by the Corporation; and (ii) estimates of anticipated claims on the Corporation. (2) The statements and estimates filed under paragraph (1) of this subsection shall preserve the rights of the Corporation against the assets of the insolvent insurer.

10. INS § 9–306(d) provides, in relevant part, that:

(1) The Corporation shall: (ii) assess member insurers separately for each account in amounts necessary to pay: 1. the obligation of the Corporation under subsection (a) or (b) of this section after an insolvency; 2. the expense of handling covered claims after an insolvency; 3. other expenses authorized by this subtitle.

dation proceeding and PCIGC's potential liability resulting from the insolvency of an insurance carrier. If the filing of a claim provided notice to PCIGC of all potential claims arising out of the one incident, PCIGC's potential liability would extend until the statute of limitations ran on all potential claims arising out of the original claim. As this case illustrates, such a result renders PCIGC unable to seek recovery against the bankruptcy estate of the insolvent insurer for those claims because the estate is not obligated to accept claims filed after the bar date, thus frustrating section 9–309(c) of the statute.[11]

Other courts that have addressed the issue of claims filed beyond the bar date have reached the same conclusion as we do today—that the various guarantee associations are not liable for the late-filed claims. *See Union Gesellschaft Fur Metal Industrie Co. v. Illinois Insur. Guar. Fund,* 190 Ill.App.3d 696, 138 Ill.Dec. 21, 546 N.E.2d 1076, 1079 (1989) (noting that "[t]he requirement in the statute that claims be filed on or before the last date fixed for the filing of proofs of claim evidences an intent by the legislature to provide a cutoff date after which the Illinois Guaranty Fund is no longer obligated to indemnify claims," and that the plaintiff's ignorance of the claim was not "recognized by the statute"); *Satellite Bowl, Inc. v. Michigan Prop. & Cas. Guar. Assn.,* 165 Mich.App. 768, 419 N.W.2d 460, 462 (1988) (holding that a claim filed after the last date fixed for the filing of claims was not a "covered claim," and noting that "[t]he requirement in the statute that claims be presented before the filing deadline evidences an intent on the part of the Legislature to provide a cutoff date after which the association is no longer obligated to accept claims"); *Lake Hospital System, Inc. v. Ohio Ins.*

---

11.  In determining PIE Mutual's insolvency, the Ohio court specifically held that contingent and future claims were subject to the bar date. The order provided that "[a]ll Contingent Claims and all Future Claims, as defined in the Notice, will be forever barred and foreclosed after September 23, 1999." The contribution claim, as it existed at the time of the bar date, was a future claim as Dr. Goldstein had no knowledge of its existence prior to the bar date.

*Guar. Assn.,* 69 Ohio St.3d 521, 634 N.E.2d 611, 615 (1994) (holding that "once a liquidating court establishes a definitive bar date, [the Ohio Insurance Guaranty Association] becomes statutorily obligated to observe the finality of that date," and noting that "[w]ere we to hold otherwise, the specific filing deadline set forth in [the Ohio statute] would be rendered meaningless"); *Whitehouse v. Rumford Prop. & Liab. Ins. Co.,* 658 A.2d 506, 508 (R.I.1995) (noting that "although an insolvency fund serves 'to eliminate the risk for policyholders of doing business with an insolvent insurer,' there must be some degree of finality to liquidation proceedings," and that "even though one purpose of the act is 'to avoid financial loss to claimants or policyholders because of the insolvency of an insurer,' we must give effect to the clear legislative intent of [the statute], which prohibits any claim from being filed after the bar date"); *Cannelton Industries, Inc. v. Aetna Cas. & Sur. Co. of America,* 194 W.Va. 203, 460 S.E.2d 18 (1994) (finding that "by the time Cannelton was faced with a viable claim . . . it was no longer a 'covered claim' under [the West Virginia statute]" which defined "covered claim" as not including "any claim filed with the guaranty fund after the final bar date set by the liquidation court . . .").

We hold that based on the plain language of the statute, Dr. Goldstein's claim for indemnification is not a "covered claim" because it was not presented to PCIGC prior to the absolute and final bar date as required by INS § 9–301(d)(1)(ii). Timely notice to PCIGC of an actual claim is not timely notice of all potential claims arising out of the same event. Accordingly, PCIGC is not obligated to provide a defense and to indemnify Dr. Goldstein in the contribution action.

Having concluded that PCIGC is not liable for the defense and potential indemnification of Dr. Goldstein, we turn to the question of whether Medical Mutual is so required.

### The Claim Against Medical Mutual

The question before this Court with regard to Medical Mutual is whether its insurance policy covers the contri-

bution action. We have noted that "[w]hen determining coverage under an insurance policy, 'the primary principle of construction is to apply the terms of the insurance contract itself.'" *Bausch & Lomb Inc., v. Utica Mut. Ins. Co.,* 355 Md. 566, 581, 735 A.2d 1081, 1089 (1999) (internal citations omitted); *see also, Mut. Fire, Marine & Inland Ins. Co. v. Vollmer,* 306 Md. 243, 250, 508 A.2d 130, 133 (1986) (noting that "[u]nless a statute, regulation, or public policy would be violated, the first principle of construction of insurance policies in Maryland is to apply the terms of the contract"). We begin, therefore, with the language of Dr. Goldstein's policy with Medical Mutual.

Section I of the Medical Mutual policy provides:

We will pay, on behalf of an insured, those sums that the insured becomes legally obligated to pay as damages because of a "claim" caused by an "incident" occurring in the "coverage territory" and arising out of "professional services." This insurance only applies to "claims" first made against any insured during the policy period for "incidents" occurring after the Retroactive Date specified in the Declarations. It does not apply to any "incident" occurring or "claim" first made against any insured after the termination of the policy period. All "claims" for damages arising out of any one "incident" will be deemed to have been made at the time the first of those "claims" is first made against any insured. This insurance is subject to all terms, conditions, and exclusions included in this policy.

The word "claim" is defined in the policy as "a 'suit' or other request for compensation, made by or on behalf of an injured party, because of alleged 'bodily injury,' 'property damage,' or 'personal injury' to which this insurance policy applies." The word "incident" is defined, in relevant part, as "a single act or omission or a series of related acts or omissions (including, but not limited to, multiple misdiagnoses) arising out of the rendering or failure to render 'professional services' to a single person." "Suit" means "a civil proceeding alleging damages because of 'bodily injury,' 'property damage,' or 'personal injury' to which this insurance applies. 'Suit' includes an

arbitration proceeding alleging such damages to which you must submit or to which you submit with our consent."

Dr. Goldstein's policy with Medical Mutual is a "claims made" policy as opposed to an "occurrence" policy. We discussed the distinction between the two types of policies in *Vollmer*, 306 Md. 243, 508 A.2d 130. We said:

> Generally speaking, "occurrence" policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. Conversely, "claims made" (or "discovery") policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred. There are, of course, hybrids of the two varieties.

*Vollmer*, 306 Md. at 252, 508 A.2d at 134 (internal citations omitted). We went on to note that " '[c]laims made,' or 'discovery' policies . . ., are of relatively recent origin and were developed primarily to deal with situations in which the error, omission, or negligent act is difficult to pinpoint and may have occurred over an extended period of time," as is often the case in professional malpractice cases. *Vollmer*, 306 Md. at 253, 508 A.2d at 135 (internal citations omitted). Although Dr. Goldstein's insurance policy is a "claims made" policy, the specific terms of that policy limit his right of recovery against Medical Mutual. We explain.

Dr. Goldstein argues that the contribution claim constitutes an entirely new action because Dr. Blundon chose to file a separate action, HCA No. 2002–177, instead of filing a cross-claim in the medical malpractice suit, HCA No. 95–0006. He concludes that "HCA 2002–177 is an actual claim filed within Dr. Goldstein's policy period with Medical Mutual and Medical Mutual should therefore be obligated to assume his defense."

The problem with this argument is that it disregards the language of the policy which states that "[a]ll 'claims' for damages arising out of any one 'incident' will be deemed to have been made at the time the first of those 'claims' is first

made against any insured." [12]    Assuming, for purposes of argument, that the contribution claim is a new and distinct claim from the medical malpractice suit, it clearly arises from the same "incident," the injury to Ms. Taylor.[13]  Based on the language of the policy, the contribution action is "deemed to have been made at the time the first of those claims is first made against any insured," in this instance January 6, 1995, when the medical malpractice suit was filed.  To be covered by the Medical Mutual policy, the first claim arising out of the injury to Ms. Taylor must be made during the coverage period.  The coverage period of Dr. Golstein's policy with Medical Mutual was January 1, 2002, to January 1, 2003.  The first claim arising out of Ms. Taylor's injury, however, was filed seven years before the Medical Mutual coverage period.

We hold that, based on the language of the policy, Medical Mutual is not required to provide a defense or indemnification to Dr. Goldstein in the contribution action.  Although the contribution action was first made during the coverage period,

---

12.   In its brief, Medical Mutual notes:

The rationale behind such policies is clear:  by explicitly limiting coverage to new claims, insurance carriers avoid the problems associated with assuming the coverage, defense, or indemnity for claims with which they had no involvement in the decision-making, negotiations, investigations, or litigation process because the claim was made under a prior policy.

13.   Although we need not decide the issue today, the question of whether a contribution action can be "a new and distinct" claim is an interesting one.  The right to contribution is inchoate "until one joint tortfeasor 'has by payment discharged the common liability or has paid more than his pro rata share thereof.'"  *Montgomery County v. Valk Manufacturing Co.*, 317 Md. 185, 191, 562 A.2d 1246, 1249 (1989) (quoting Md.Code (1957, 1986 Repl.Vol.) Art. 50, § 17(a), now codified at Md.Code (1974, 2002 Repl.Vol.) § 3–1401 *et seq.* of the Courts & Judicial Proceedings Article).  In *Valk* we held that "[u]nder the [contribution statute], contribution is available only among joint tortfeasors. A joint tortfeasor must be legally responsible to the plaintiff for his or her injuries."  *Valk Manufacturing Co.*, 317 Md. at 200, 562 A.2d at 1253.  Because a legal determination of liability among joint tortfeasors is required to maintain a contribution action, it would seem that the two causes of action cannot be "new and distinct" because liability for contribution arises only from a legal determination of joint liability or settlement.

the first claim arising out of the injury to Ms. Taylor was made prior to the coverage period. The policy specifically states that "[a]ll 'claims' for damages arising out of any one 'incident' will be deemed to have been made at the time the first of those 'claims' is first made against any insured." Therefore, the claim is not covered by the policy.

### Conclusion

We appreciate the hardship to Dr. Goldstein that results from our holdings here today. Through no fault of his own, Dr. Goldstein is left without coverage for a claim that but for PIE Mutual's insolvency would have been covered by his PIE Mutual policy. The PCIGC statute serves to lessen the impact on Maryland residents insured by insurance companies that become insolvent. The coverage, however, is not absolute. If the statute is to be amended to cover claims which are unknown to the insured of an insolvent insurer prior to the bar date, that change must come from the General Assembly. In addition, we are not at liberty to disregard the language of a policy issued by a solvent insurance company and require that it cover claims which are the obligation of an insolvent insurance company. Insurance companies doing business in Maryland already bear a portion of the burden of insolvent insurance companies through assessments by PCIGC.

JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED. THE PARTIES TO PAY THEIR OWN COSTS.